## DRUMMOND v. WHITE-SWEARINGEN REALTY CO.†

(Court of Civil Appeals of Texas. Amarillo. Feb. 12, 1914. Rehearing Denied March 14, 1914.)

1. INSURANCE (§§ 96, 111*)—FOREIGN CORPORATIONS—CIVIL LIABILITY OF AGENTS.

Under Rev. St. 1911, art. 4961, providing that any person soliciting insurance for any insurance company, or taking or transmitting, other than for himself, any application or policy, or receiving or delivering a policy, etc., shall be held to be the agent of the company, and article 4962, providing that any person doing any of such acts for or on behalf of any insurance company which has not complied with the requirements of the laws of this state shall be personally liable to the policy holder, an insurance agent, whose companies would not accept a particular risk, and who called the owner's attention to the advertisement of a broker in another state, and was asked by the owner to procure a policy through such broker, and did so procure a policy in a company not authorized to do business in this state, which he had never previously represented, was the agent of such company, and was personally liable on the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 126; Dec. Dig. §§ 96, 111.*]

2. INSURANCE (§ 111*) — FOREIGN CORPORATIONS—CIVIL LIABILITY OF AGENTS—DEFENSES.

Under Rev. St. 1911, art. 4962, providing that any person, doing any of the acts on behalf of any insurance company which has not complied with the laws of this state, which, under article 4961, makes him the agent of such company, shall be personally liable to the holder of the policy of insurance in respect of which such act was done for any loss covered thereby, any legal defense available to the company is available to such agent.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 111.*]

3. INSURANCE (§ 111*)—FOREIGN CORPORATIONS—CIVIL LIABILITY OF AGENTS—PLEADING.

Under Rev. St. 1911, art. 4962, making agents for insurance companies which have not complied with the requirements of the laws of this state personally liable to policy holders, and article 4874, providing that a fire policy in case of a total loss by fire shall be considered a liquidated demand for the full amount, an agent when sued has the burden of negativing the loss asserted.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 111.*]

4. INSURANCE (§ 499*)—AVOIDANCE FOR MISREPRESENTATION—STATUTORY PROVISIONS.

Under Rev. St. 1911, § 4874, providing that a fire insurance policy in case of a total loss shall be a liquidated demand against the company for the full amount thereof, and article 4948, providing that in suits on insurance policies no defense based upon misrepresentations made in the application or in obtaining or securing the contract shall be valid, unless defendant shall show that within a reasonable time after discovering the falsity of the representations it gave notice that it refused to be bound by the policy, a policy for $4,000, where there was a total loss, was a liquidated demand for that amount, though the property was worth only $1,000, where the insurance was not induced by any representation by insured.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1274; Dec. Dig. § 499.*]

5. INSURANCE (§ 111*) — FOREIGN CORPORATIONS — CIVIL LIABILITY OF AGENTS — DEFENSES.

Under Rev. St. 1911, art. 4962, making the agent of insurance companies which have not complied with the requirements of the laws of this state personally liable to policy holders, and article 4948, providing that no defense based upon misrepresentation in the application or in obtaining or securing any insurance contract shall be valid unless the insurer, within a reasonable time after discovering the falsity of the representation, shall give notice that it refuses to be bound by the contract, the agent is bound by the company's failure to give such notice.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 111.*]

Appeal from District Court, Cottle County; Jo. A. P. Dickson, Judge.

Action by the White-Swearingen Realty Company against T. M. Drummond. Judgment for plaintiff, and defendant appeals. Affirmed.

Bell & Bell, of Paducah, and Jas. H. Aynesworth, of Childress, for appellant. Browne & Hawkins, of Paducah, and Fires, Decker & Clarke, of Quanah, for appellee.

HENDRICKS, J. The following statement of this cause is extracted substantially from the briefs of the litigants, supplemented by a consideration of the transcript, and was a suit by the appellee against the appellant, upon two policies of fire insurance, insuring appellee's hotel property and furniture. The appellee alleged that the appellant, Drummond, acting as broker and agent, procured from the Franklin Fire Insurance Company of Wilmington, Del., the said policies of fire insurance and delivered the same to appellee in consideration of certain premiums paid by appellee, and that during the life of the policies the property insured was wholly destroyed by fire, and that proper proof of loss, as required in said policies, was made upon advice and with the assistance of the appellant, and transmitted to the insurance company, and demand for payment from the insurance company having been made and refused, the latter thereby became liable to pay the amount stipulated in said policies as a total loss. The Franklin Fire Insurance Company, as alleged in appellee's petition, at the time of the issuance by it of the said fire insurance policies had not complied with the requirements of the laws of this state as to the transaction of the business of writing fire insurance, and was not authorized under the law, as a foreign corporation, to transact an insurance business in this state. Appellee further avers that the appellant, Drummond, solicited the insurance on behalf of said insurance company, and transmitted to the same an application by appellee for a policy of insurance in said company, and that appellant received from said insurance company the two policies in question, and delivered the same to the appellee, receiving from

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

† Application for writ of error pending in Supreme Court.

it the premiums therefor, transmitting the same to said insurance company, after deducting his commission, and that appellant after the fire prepared and assisted in preparing the proof of loss of said property to be presented to said company; that by virtue of such acts and agency for the insurance company, Drummond became indebted and liable to pay the sum of said policies. The appellant answered that the insurance was procured at the instance and request of the appellee and as his agent, and not as the agent of the insurance company, and that appellee had full knowledge of the facts concerning said insurance and concerning said company, and, after such information had been imparted to it, then directed the appellant to procure the insurance, and in accordance with said instructions the appellant procured the same. The appellant also alleged a fraudulent overvaluation of the property by appellee in stating the value of the same at $4,000, which was the amount of insurance upon the property, when in fact the real value was less than $1,000, and that on account of the fraudulent representation and application for said insurance the policy was void, further alleging that if the issuance and delivery of the policies involved in this suit were illegal, the appellee was cognizant of the facts constituting the illegality of the same, and with such knowledge procured the appellant to obtain from the insurance company the policies in question, and "aided, abetted, and encouraged" the appellant in the violation of the laws of the state, and is estopped from claiming any loss against him. The trial court, after the submission of the evidence, peremptorily instructed the jury in favor of the appellee for the full amount of the insurance stipulated in the policies.

[1] The appellee is attempting to impress liability upon appellant by virtue of the following articles of our Insurance Statutes, embodied in the Rev. St. 1911:

"Article 4961. Any person who solicits insurance on behalf of any insurance company, whether incorporated under the laws of this or any other state or foreign government, or who takes or transmits other than for himself any application for insurance or any policy of insurance to or from such company, or who advertises or otherwise gives notice that he will receive or transmit the same, or who shall receive or deliver a policy of insurance of any such company, or who shall examine or inspect any risk, or receive, or collect, or transmit any premium of insurance, or make or forward any diagram of any building or buildings, or do or perform any other act or thing in the making or consummating of any contract of insurance for or with any such insurance company other than for himself, or who shall examine into, or adjust or aid in adjusting any loss for or on behalf of any such insurance company, whether any of such acts shall be done at the instance or request, or by the employment of such insurance company, or of or by any broker or other person, shall be held to be the agent of the company for which the act is done, or the risk is taken, as far as relates to all the liabilities, duties, requirements and penalties set forth in this chapter. * * *

"Art. 4962. Whenever any person shall do or perform within this state any of the acts mentioned in article 4961 for or on behalf of any insurance company therein referred to, such company shall be held to be doing business in this state, and shall be subject to the same taxes, state, county and municipal, as insurance companies that have been legally qualified and admitted to do business in this state. * * *" And article 4962 further provides: "Any person who shall do any of the acts mentioned in article 4961 for or on behalf of any insurance company without such company has first complied with the requirements of the laws of this state, shall be personally liable to the holder of any policy of insurance in respect of which such act was done for any loss covered by the same."

Article 4961, supra, of our Civil Statutes, as to the designation of acts constituting statutory insurance agents, is also in hæc verba a part of our Penal Code, viz., article 644, Revised Criminal Statutes 1911, and which, followed by article 645 of the Code, make the person, who performed the acts denominated in the statute of any insurance company failing in authority to do business in this state, subject to a considerable fine and imprisonment.

We conclude from the testimony of Mr. Drummond that he was engaged in the insurance business, and as the proper representative of Texas companies had been insuring the property of the appellee, consisting of a bank building, a store building, a gin and a residence, and also "wrote the risk on the hotel at Swearingen in said companies," and they instructed him to cancel the same; W. D. Hutchins, appellee's agent, instructed him to write that insurance on the hotel property. When the regular licensed companies represented by him canceled the insurance upon the hotel property he informed Mr. Hutchins of that fact, and the latter questioned Drummond if he could get any other company to carry the insurance, and Drummond said: "I told him I would make an offer along that line. * * * I then saw Mr. Jordan and asked him to carry it after my company had refused, and he said his company would not carry it [meaning the hotel property]. I then saw Mr. Abernathy and one of his companies carried it for a year, and another one carried it for a little while, and then canceled it, and they refused to carry it any longer." He said that Mr. Hutchins instructed him to write the policies in his company on the other property, that is, the bank building, the store building, the gin and the residence, and the

policies were delivered to Hutchins. He further testified, with reference to the refusal of the licensed companies doing business in this state insuring the hotel: "I was not able to get the hotel carried in any of the companies I knew in Texas. * * * I told Mr. Hutchins [the agent of appellee] I was unable to get a state company to carry the hotel property. I believe I told him of some literature I had gotten from a broker in Brooklyn, N. Y., and he was advertising mutual companies, but I did not mention the name of any particular company, I told him I might be able to get that broker to carry it, and he said: 'Well, I suppose that would beat no insurance at all. You see if you can't get a policy through this mutual company'—and I did it. (We do not mean to state that it is an undisputed fact that these particular policies were in a mutual company.) I didn't know what company this man, the Brooklyn broker, was representing. I told Mr. Hutchins that I knew nothing of this company; that he knew just as much about it as I did. Yes, sir; I wrote the broker for insurance, and he sent me a policy, and I sent it over to Mr. Hutchins." Drummond had never represented the Franklin Fire Insurance Company in any manner prior to this time. The policy was not executed by him as agent but as a result of communications with the Brooklyn broker. They were executed by the officers at the home office, and directly forwarded to Drummond, who delivered the same to the appellee. Drummond further said: "The White-Swearingen Realty Company didn't pay me anything other than the premium therein specified. * * * I think I received 25 per cent. of the premium. * * * Fifteen per cent. is as much as any of my companies will pay." The first letter in answer to Drummond's communication in regard to the insurance authorized this deduction of the commission. "The policies I wrote that were good I represented the insurance company, * * * but when I wrote this other policy I didn't write the insurance companies for I had exhausted my means of getting insurance and had to go to this one. I have never paid $25 to the Commissioner of Insurance and Banking for the purpose of writing insurance in foreign companies not authorized to do business in this state. I have never filed a bond in the sum of $1,000 payable to the Governor, so I could write that kind of insurance. * * * After the fire I prepared the proof of loss for the company at Mr. White's request and did that to comply with the terms of the policy. * * *"

It seems that Mr. White, an officer of the company, had some communication with Mr. Drummond, with reference to the insurance in this manner, continuing to quote from Drummond's testimony: "In the summer of 1912, Mr. White had the policies sent down to him at Weatherford and wrote me to that effect. I didn't tell Mr. White or Swearingen that the Franklin Fire Insurance Company was authorized to do business in Texas. I didn't tell them it was not authorized to do business in Texas. White-Swearingen Realty Company had sufficient notice through their agent as to the class of insurance they were getting. They had possession of this policy that had expired. Mr. White wrote me a letter to renew it, and I did so at his request and wrote him at the time that it was a mutual policy. Q. You told Hutchins, didn't you, that this company did not have authority to do business in Texas? A. That was the understanding between me and him. Q. You told him that? A. I told him it was an Eastern broker. I told him that the insurance would be procured through an Eastern broker. * * * Q. Did you tell him that the company you were writing that in was not authorized to do business in Texas? A. No, sir; I do not suppose I did; but I do not presume they were, or they would have had a representative in Texas. Q. You won't tell this jury that you told Mr. Hutchins that this company was not authorized to do business in Texas, will you? A. I do not know that I told it in those words, but I told him that the policy would be issued through an Eastern broker. Q. You have plead here that you told Mr. Hutchins, agent of White-Swearingen Realty Company, that this company was not authorized to do business in Texas? A. That was my understanding. Q. You say that you told Hutchins that? It is a fact you did tell him or you didn't. A. According to the best of my recollection, I told him that it was authorized to do business in Texas. Q. Was that when you told him you were going to get a mutual company? A. Yes, sir. Q. You didn't know what company it was going to be in * * * when you told him you were going to issue through an Eastern broker. A. No, sir. Hutchins was willing to take chances in an Eastern company. * * * I didn't tell Hutchins at the time I delivered him this policy that the company was insolvent."

It is shown that the Brooklyn broker, Anthony, had correspondence with no other person than Drummond in regard to appellee's insurance, and in a letter written to Paducah Land Company (Drummond) dated May 14, 1912, the broker acknowledges the receipt of an application of insurance for $2,375 (in reality addressed to another brokerage company, and forwarded to Anthony), and says: "At any time you want $2,375.00 more insurance on the same risk, please forward the application. You will observe a clause regarding a reinsurance of this policy and for that reason I ask you to deliver the same promptly, collect for the same on delivery, and remit this office New York draft as the company has to pay cash for reinsurance." The additional insurance for the additional amount, $2,375 was written, and the policy delivered by Anthony to Drummond, executed by the same company,

with a permission to Drummond to deduct the 25 per cent. commission. Drummond said: "In none of the letters I had from Anthony, he never told me that the company was not authorized to do business in Texas. * * * At the time I handed Mr. Hutchins his Franklin policies, he knew as much about it as I did and I could not say whether I told him it was not authorized to do business in Texas."

The appellant advances the proposition under its first assignment that: "There being an issue of fact as to whether defendant was acting as the agent of the plaintiff in the procuring of the policies, and there being the issue of fact as to whether the plaintiff had full and complete knowledge of each and every fact concerning the insurance company and the conditions of the policies, it was error for the court to withdraw the case from the consideration of the jury," and cites the following cases in support of the proposition: Vertrees v. Head & Matthews, 138 Ky. 83, 127 S. W. 523; McBride v. Rinard, 172 Pa. 542, 33 Atl. 750; Webster v. Ferguson, 94 Minn. 86, 102 N. W. 213; Hartman v. Hollowell, 126 Iowa, 643, 102 N. W. 524.

We believe that a close reading of the case of Vertrees v. Head & Matthews, supra, by the Kentucky court, exhibits an inapplicability to the case here. It is true that the acts within the Kentucky statute, constituting the person manifesting such acts a statutory agent of the insurance corporation are similar, and in some respects the same as in our statute stamping agency, although the acts are not so many; however, the purpose seems to make the person who performs such acts an agent, "anything in the policy to the contrary notwithstanding," and it is noted there was no statute in Kentucky making such statutory agent liable as in our state, on account of performing any of the acts mentioned in the statute, for a company which has not complied with the laws of the state; and the court, in deciding that it was a jury question, rather solved the case by holding that if the insurance agents between the company and Vertrees "acted merely as an accommodation to him, and told him that they were not agents for the company, and it had no authority to do business in this state, and they had no knowledge of its condition or standing, then Vertrees did not innocently or in ignorance of the true state of facts accept the policy, and must be held to have assumed the risk of the solvency of the company and its liability to discharge the agreements under its contracts. * * * If the transaction was in violation of the statute, he was knowingly a party to it, and so cannot hold the agents personally responsible." In violation of what statute?

Kentucky had a statute providing that an agent "who acts without a license shall be guilty of a misdemeanor and subject to a fine," but did not have a statute making any person liable to the insured if he violated such a law requiring him to procure such a license, and this necessarily is the penal liability referred to in the opinion, when the court states that Head & Matthews may be liable criminally, although not liable civilly to Vertrees, and upon the matter of agency the court is apparently illogical, when it says, "The language of the sections * * * quoted is broad enough to make Head & Matthews agents upon their admission that they transmitted the application for Vertrees to the company," for the reason that unless it was intended to hold that statutory agency was not, and could not be, a predicate of liability, the declaration of statutory agency was unnecessary, which was more likely, as the instructions written by that court, for the government of the trial court guiding it in the submission of the matter to the jury, did not embody the statutory elements as ingredients of agency, but such instructions were based entirely upon agency in fact at common law. In this character of case it is not so much a question of agency in fact at common law, as one, Are the acts performed by the persons such as to come within the spirit and meaning of the statute as to constitute a statutory agency? Are they stamped by the statute sufficiently as that the liability would follow? The cause of Webster v. Ferguson, 94 Minn. 90, 102 N. W. 214, by the Supreme Court of Minnesota, had under consideration the following sections of the Code of that state:

"Sec. 25. Any person who solicits insurance and procures the application therefor shall be held to be the agent of the party thereafter issuing the policy upon such application or a renewal thereof, anything in the application or the policy to the contrary notwithstanding."

"Sec. 87. An insurance agent shall be personally liable on all contracts of insurance unlawfully made by or through him directly or indirectly for or in behalf of any company nor authorized to do business in this state."

It is noted that under the Minnesota statute, section 25, that the person who solicits the insurance and procures the application is held to be the agent of the party issuing the policy upon such application, notwithstanding a contrary stipulation, and the insertion of such stipulation is often the practice of insurance companies in attempting to "shed" responsibility for the acts of their own agents actually employed and represented by them; and the court, in construing section 87, making an insurance agent personally liable on contracts of insurance unlawfully made by or through him, in connection, we presume, with the other statute, said that the liability, "grows out of the contractual relation of the parties, and can be enforced only by the insured, who has been made a victim in accepting unlawful insurance." In this case there was quite a vigorous dissenting opinion, both upon the facts and upon the law, the latter necessarily based upon the

facts, and in the construction of section 25 of the act, the dissenting judge saying that "to hold that respondent was not the agent of the insurance companies, but, on the other hand, the representative of appellants, and therefore not liable, will, in my opinion, open the door in Minnesota to the transaction of insurance business by such companies, and furnish them an easy method of violating its public policy as expressed by the Legislature"; and he previously had said: "The purpose of the Legislature in enacting section 87 was to protect the public from the evil results incident to the writing of insurance throughout the state by so-called 'wildcat' companies, and the provision making the agent negotiating such unauthorized insurance liable upon the contract negotiated was intended to operate as a check against the increase of such business." The majority of the court in Webster v. Ferguson, reversed and rendered that cause in favor of the insurance agent upon the evidence.

The Supreme Court of Iowa, in the cause of Hartman & Daniels v. Hollowell, supra, had under consideration section 1749 of its Code, which is substantially in the same language as section 25, supra, quoted from the Supreme Court of Minnesota, and was a case where the insured was suing the agent for soliciting insurance in a nonlicensed company, without any statute impressing personal liability upon the agent, similar to the Kentucky case in that respect. However, under another section of the Code of that state, an agent was prohibited from acting for insurance companies in transacting business of insurance in the state without his procuring from the auditor of the state a certificate that such company had complied with the law, and under another section if he acts with knowledge that such company "is doing business in an unlawful manner, or is insolvent, or solicits insurance with said company or association," etc., he is guilty of a misdemeanor. The judgment of the trial court and the verdict of the jury were affirmed in this case by the Supreme Court of Iowa, which said that: "The defendant does not pretend to have supposed these companies were authorized to do business in the state, and his only apology to relieve him from the charge of negligence is that he acted at the instance of the plaintiffs in obtaining insurance from companies neither knew anything about. But whether he did so was an issue for the jury to determine." This same Supreme Court, 17 years previously, in the case of Insurance Co. v. Sharer, 76 Iowa, 286, 41 N. W. 20, construing the same article, 1749, upon a state of facts indicated by the quotation said: "Now, while Giberson did not solicit the insurance in the sense of having importuned defendants to apply for it, he did procure the application within the meaning of the statute; for he received it, and at his request the policy was issued upon it. To hold otherwise would

be to put an exceedingly narrow construction upon the words of the enactment, and one which in many cases would defeat the manifest legislative intent. The manner in which such business is transacted is known to all men. Prudent business men and property owners do not wait to be personally solicited," but "their custom is to apply to the agent of some company or association engaged in the business of insurance; and, if the agent is a mere solicitor, their application is forwarded to some agent or officer having authority to accept or reject it. The statute was as certainly intended to apply to transactions of that kind as to those in which the agent procured the application by personal solicitation, and that was the character of the transaction in question. We conclude, therefore, that Giberson was the agent of plaintiff in the transaction."

The right of the exclusion of foreign corporations (without noting exceptions), including insurance corporations, is one of the most important unsurrendered powers of a state government. The absolute right to exclude carries the necessary correlative right of admission upon conditions which must be complied with. Commonwealth v. Nutting, 175 Mass. 154, 55 N. E. 895, 78 Am. St. Rep. 483; Hooker v. State of California, 155 U. S. 649, 15 Sup. Ct. 207, 39 L. Ed. 297; Taber v. Building & Loan Association, 91 Tex. 92, 40 S. W. 954. The suppression of a violation of such laws by indirection, and preventing the entrance of foreign corporations, except upon conditions, in this instance accepting applications for insurance through persons in this state, thereby doing the thing which the statute inhibits, is the important ingredient of public policy assisting the interpretation of the statutes quoted. See authorities cited.

The cause of Hooker v. the State of California, by the Supreme Court of the United States, affirming the decision of the Supreme Court of California, was one involving the conviction of an insurance agent for "procuring or agreeing to procure" maritime insurance with a foreign company which had failed to comply with the law requiring such companies to file a certain bond before transacting insurance business within that state, which is also a prerequisite in Texas in regard to such insurance companies. Article 4870, R. S. 1911. It was urged in that case that the conviction was illegal because the statute undertook to forbid the procurement of contracts outside of the state; and the same question substantially was involved in the case of Commonwealth v. Nutting, decided by the Massachusetts Supreme Court, supra. The facts here are not the same involved in the two cases mentioned, and we admit the analogy is remote as bearing upon the facts as to the civil liability of Drummond, except that the underlying reasons of the statutes relating to insurance, and the court's avoidance of a construction of the

same retarding the purposes for which they were enacted, are so aptly put, as to suggest quotations. In the United States Supreme Court Case the position was advanced that the broker, "who agrees to procure any insurance for a resident" of the state of California, was the agent of such resident in procuring the same; and hence the contract of insurance having been procured by the agent of the insured, and the foreign corporation not having complied with the state law, such corporation could not be legally within the state for the purpose of giving its assent to the contract, further urging that the contract of insurance, according to this theory, was in reality consummated without the state between the resident, through its own agent, and the foreign corporation, and that because a foreign contract could not be condemned by state law, there was no violation of said law. Mr. Justice White said: "If the contention of the plaintiff in error were admitted, the established authority of the state to prevent a foreign corporation from carrying on business within its limits, either absolutely or except upon certain conditions, would be destroyed. *It would be only necessary for such a corporation to have an understanding with a resident that, in the effecting of contracts between itself and other residents of the state, he should be considered the agent of the insured persons, and not of the company.* This would make the exercise of a substantial and valuable power by a state government depend, not on the actual facts of the transactions over which it lawfully seeks to extend its control, but upon the disposition of a corporation to resort to a mere subterfuge in order to evade obligations properly imposed upon it. Public policy forbids a construction of law which leads to such a result, unless legally unavoidable." (The emphasis is ours). In the case of Commonwealth v. Nutting, supra, decided by Chief Justice Holmes, where an insurance agent was convicted for aiding in the transaction of insurance with a company which had not been admitted to do business in the state of Massachusetts, it was said: "One main object in imposing such conditions in this commonwealth is to secure people against fraudulent or worthless contracts, and, in case of litigation, to save them from having to go abroad."

As stated, the public policy involved is the prevention of the violation of the state law, and the suppression of the character of insurance indicated which may be solicited from the residents of a state by irresponsible companies who have not the assets, or if they have the resources, have not the inclination, to yield to the law of the state on a parity with state companies and foreign companies who do comply. The protection of its citizens against contracts difficult and expensive to enforce, if enforceable, made by foreign corporations, sheltered in a foreign jurisdiction, with no assets in this state to meet its obligations, is necessarily an important object. Insurance is almost in the nature of a tax, though not compulsory, and the foreign corporation should give assurance that it will pay its policy holders and be placed upon an equality with other insurance companies as to the maintenance of government; without enforcement of some law of this character such insurance companies would, in a sense, be protected against those who do comply with the law—the latter could not give the rates accorded by the former, and the plane of competition would not be equal, as the burdens of each are diverse, and the consequences to the citizens and government are such as to cause the substantial and proper enforcement of such laws to become a wholesome object. We will admit that the interpretation of statutes of this character could become unreasonable to the extent that, within the letter of the law, if A. has B., his agent or employé, to perform the acts designated in the statute, to transmit the application for insurance, or a policy, or transmit the premium, or make and forward a diagram of the principal's buildings, etc., to some insurance company, and to hold such an agent or employé liable, it would be in such violation of the spirit of the statute as not to be within its letter, although so designated. It would be like, as cited by Blackstone, attempting to include a surgeon, who opened the vein of a person that fell in the street with a fit, as liable under the Bolognian statute, which enacted "that whoever drew blood in the streets should be punished with the utmost severity." Blackstone, Com., vol. 1, p. 40.

However, when we apply the statute to one who is engaged, like Drummond, in the business of insurance in this state, we think a different reason and a different policy prevails. This class of persons is sought as intermediaries, whether by the insured or the insurer, as the purveyors of insurance, and, to say the least of it, such persons are the subjects, who may, by conducting the negotiations between the parties, advance a violation of the statute instead of retarding the same; and, as was well said by Chief Justice Holmes, in the Nutting Case, supra, adopted by the Supreme Court of the United States with approval, in the same case (183 U. S. 553, 22 Sup. Ct. 238, 46 L. Ed. 324, when the Nutting Case was before that tribunal), and in the case of Delamater v. South Dakota, 205 U. S. 103, 27 Sup. Ct. 450, 51 L. Ed. 731, 10 Ann. Cas. 733. "While the Legislature cannot impair the freedom of McKie [the insured] to elect with whom he will contract, it can prevent the foreign insurers from sheltering themselves under his freedom in order to solicit contracts which otherwise he would not have thought of making. *It may prohibit not only agents of insurers, but also brokers, from soliciting or intermeddling in such insurance, for the same reasons.*" (The emphasis is ours.) Our statute is quite stringent, and leaves

very little to construction. Reverting to article 4961, designating the acts constituting the person performing the same as the agent of the insurance company, it not only embraces the acts designated in all other statutes we have investigated, but if such person performs or does "any other act or thing in the making or consummating of any contract of insurance *for or with any such insurance company other than for himself, * * * whether any of such acts shall be done at the instance or request, or by the employment of such insurance company, or of or by any broker or other person.*" (The emphasis is ours.)

In the case of Woolwine v. Mason, 157 S. W. 682, the Supreme Court of Tennessee, in construing a statute very similar to ours, and containing the same language we embrace in quotations, held that the defense here interposed was unavailable, reversing and rendering the cause in favor of the insured. Tennessee also by a section of its Code made the agent or person personally liable on contracts of insurance unlawfully made by or through him, directly or indirectly for or in behalf of any insurance company not authorized to do business in that state. The court said: "There is no escape from the meaning of this language. It must be conceded that these contracts of insurance procured for complainant by the defendants were unlawfully procured by defendants. Under the language of the statute, it makes no difference that the policies were obtained indirectly through another firm of insurance men at Chicago. * * * We think it can make no difference that complainant knew of this violation of the law by defendants. His knowledge did not make their act legal, or excuse them from the statutory penalty visited upon such dereliction. The provisions of the statute are directed against companies and insurance agents, not against policy holders. The act is remedial in its nature, and was designed for the protection of the public. * * * The agent is liable as if he were the insurer—as if he individually had written the policy. There can be no question upon this record that, viewed as an insurer, upon these several policies, defendants are liable to the complainant for the loss sustained." Also see Lathan Mercantile & Commercial· Co. v. Harrod et al., 71 Kan. 565, 81 Pac. 214, by the Supreme Court of Kansas; Morton v. Hart, 88 Tenn. 427, 12 S. W. 1026, by Chief Justice Turney.

We are unable to appreciate the distinction made in some of the decisions, as applicable to our particular statute, contended for by appellant, that the criminal liability may be imposed if the acts designated in the statute are performed, though the civil liability as applied to the same facts, would not exist, as to the question of agency. The civil statute defining who is an agent as one who does the things designated by the statute for a nonresident insurance company which has failed to comply with the law, followed by the article making such persons civilly liable, is the same statute and the same agency, based upon the same dereliction of the corporation which makes him criminally liable. The logic evidently is that if the person is an agent of the insured at common law, but if he performs the acts designated by the statute, he may be such an agent as could be prosecuted, but could not be held liable to the assured. We believe the purpose of the statute has a wider scope; it in reality makes the class aimed at, in order to suppress the evil, the insurer. The relative position of the agent, standing in the shoes of the insurance company, where the question is considered by the decisions, stamps the status of the agent as the insurer. The primary purpose of the law could never be solved if you interpolate into the statute common-law agency, if the agent in reality performed the acts designated in the statute, for the reason that it would conflict with the act to that extent, and all that would have to be done under such an interpretation to defeat the strong purpose of the law, as Justice White said in the Hooper Case, supra, would be to have an "understanding." The ordinary manner of procuring insurance by the insured is to consult insurance agents, as was done in this case. The insurance agent informs the seeker of insurance that it is understood he will represent the latter solely as his agent, and if he procures insurance out of the state from a company which has not complied with the law, the insured must take his chances. However, we do not think these parties are in pari delicto under the statute. The law contemplates actual conditions, as much so in a matter of this kind as in usury statutes, while the conditions may not be as impelling upon the insured as upon the borrower. The ordinary man would go as directly to his home insurance agent in trouble over his insurance, as he would to his home banker in financial difficulty.

In Smith v. State, 18 Tex. App. 71, where the convicted insurance agent had violated the same law, Judge Hurt said: "It was the intent and express purpose of * * * the act to make all persons committing any of the acts therein named, agents, whether in fact they were so or not."

In the case of Cain v. State, by the Supreme Court of Mississippi, 60 South. 732, a statute was under consideration with reference to the acts to be performed, the same as our statute; and the facts relevant to agency committed by the agents convicted in that case were, we think, identically the same as Drummond contends were committed by him in this case, and the court said, ruling out the question of common-law agency: "The object of the statute was to keep wildcat companies, or companies not complying with the law, from doing business in the state; and to that end, all persons acting as

intermediaries for such companies, whether directly or through circuitous routes, were made liable" to punishment. Also see Maryland Casualty Co. v. Gaffney Mfg. Co., 76 S. E. 1090, where the Supreme Court of South Carolina declared a local agent, who "brokered" through another agent an insurance policy, a statutory agent, under a statute identical with ours as to "acts."

Alabama in 1893 had a statute (section 1205) very similar to ours, and the same was under consideration by the Supreme Court of Alabama in the case of Noble & Ware v. Mitchell, 100 Ala. 519, 14 South. 581, 25 L. R. A. 241, a suit by the insured against the agent for transmitting a premium and a policy of insurance, and the facts on the question of statutory agency were quite similar to the facts here. A close reading of the opinion, in connection with the special charges requested by the agent and refused by the trial court, is authority on the issue of statutory agency in favor of the affirmance of this case. The question really submitted was, Did the insurance agent who procured the policy really perform the acts designated by the statute? Which, of course, if disputed should be an issue to a jury in any case. It was not submitted whether his acts amounted to real agency for the insurance company. The trial court told the jury, if the defendant transmitted the premium or the policy, "he is an agent although in point of fact he has no connection with the company," and the appellate court said, "It is the acting as agent for such a company (nonlicensed) that constitutes the 'offense' which is the foundation of the suit," and a consideration of the opinion clearly shows that the "acting as agent for the company" was constituted by the acts designated in the statute, though the agent did not have any direct dealing with the company.

As stated, the real testimony in this cause is that neither party knew anything in regard to the solvency or insolvency of the insurance company at the time the policies were delivered. The record does present the anomaly of Hutchins (who, as a jury question, we assume was the agent of the plaintiff in the negotiations with Drummond) testifying that Drummond informed him that the company did not have authority to do business in Texas and the defendant himself swearing that to the best of his recollection he informed Hutchins that the insurance company did have authority to do business in the state; we are not quite prepared to say that Drummond's testimony is a judicial admission and binding upon him as to this matter, as contended by appellee, in the face of the contradictory testimony of his own witness, though we admit, where such statements are conflicting and the other evidence does not illuminate the real truth of the fact, that it is a peculiar position to place a jury and court, in ascertaining the truth, that litigant's admission, though from recollection, if against his own interest, is to be overborne by the statement of his witness. This character of testimony appellant contends places the parties in pari delicto. We doubt its sufficiency, without expressly deciding it, but believe that the measure of the statute with reference to liability is otherwise fulfilled upon the authorities and reasons given.

[2-5] Appellant also contends that the court erred in failing to submit the issue of overvaluation and false representation as to the hotel to the jury. Article 4874, R. S. 1911, prescribes that: "A fire insurance policy, in case of a total loss by fire of property insured, shall be held and considered to be a liquidated demand against the company for the full amount of such policy; provided, that the provisions of this article shall not apply to personal property." Article 4948, R. S. 1911, prescribes: "In all suits brought upon insurance contracts or policies hereafter issued or contracted for in this state, no defense based upon misrepresentations made in the applications for, or in obtaining or securing the said contract, shall be valid, unless the defendant shall show on the trial that, within a reasonable time after discovering the falsity of the representations so made, it gave notice to the assured, if living, or, if dead, to the owners or beneficiaries of said contract, that it refused to be bound by the contract or policy; provided, that ninety days shall be a reasonable time."

In this case the proof of loss was a total loss. "A valued policy is one in which the sum to be paid as an indemnity in case of loss is fixed by the terms of the contract." May on Insurance, vol. 1, § 30. The loss, as a matter of indemnity, is fixed in our state by the terms of the statute, and becomes the terms of the contract. The contract is necessarily alive, for, if dead, the plaintiff could not recover the loss. It is remembered that our statute says that the agent shall be personally liable to the holder of the policy for any loss covered by the same. We are inclined to think that as between the agent and the insured the same criterion as to the loss under the contract is existent as between the insured and the company, and we necessarily have to revert to the proposition, What is the loss as between the latter in measuring the indemnity between the former? We think any legal defense available to the insurance company, affecting the loss or destroying the policy, is available to the defendant, because the statute makes the contract embrace, or cover, the loss, and it is that loss the agent is liable for; and if a defense of the insurance company would destroy the same, the agent is immune because the company would be. It logically follows that if it is the company's defense, which the agent uses as a destruction of the loss, covered by the policy, the burden is upon him, as upon the company, to negative the loss; this is fair to the insured,

and is all the agent could require; otherwise the scope of the agent's defense would be broader than that of the insurer, and the loss to the insured would not be that loss covered by the policy, and which, if the company could be made to pay, would be recoverable against it.

If a suit against the agent was referable to a policy embracing personalty entirely, and the policy provided that the same should be void if misrepresentations were made to the company in the proofs of loss by the insured, certainly the policy would not be void under article 4949, covering that subject, unless the representations were such as characterized by that article, making them available as a defense to the company, and the loss in that character of case covered by the policy would be the loss proven.

The answer, for the purpose of preventing a recovery of the loss, based upon fraudulent valuation, has the imperfections of a lack of allegation that any statements as to the value were made to the company, and that the company was misled, or induced to issue the policy, on account of any such statement. The plea does state that the procuring of the insurance for $4,000, when the hotel and lots were of the value of $1,000, "was a fraud upon the insurance company." The procuring of insurance for $4,000, when the lots were not of the value of $1,000, unless the insurance company acted upon the statement of the insured as to the value, and was induced to write the same on account of the representation, would not be a fraud upon the insurance company. The mere fact that the property is not worth $1,000, and the insured knows it, added to the circumstance that the company writes a policy for $4,000 and does not know the value of the property, or, if it did, was not induced to write the policy upon that account, is not a fraud upon the company; the policy continues to be a liquidated demand. We seriously doubt if this pleading would be sufficient to destroy an ordinary contract on account of fraud. Our statute says (section 4948, supra) that no defense based upon misrepresentation "in securing the contract" shall be valid unless the insurance company shall show that, within 90 days after discovering the falsity of the representations so made, it gave notice to the insured that it refused to be bound by the policy. If this defense is not available, the loss is existent and continues to be covered by the contract. The defendant is bound by the company's omissions under this statute, as it affects the policy and the loss covered by the same. If the company failed to discover the falsity of the representations, the agent fails to plead it, or if the company ever discovered the same and sent the notice required by law, there is likewise a failure in pleading.

If we are correct in our exposition of the statute with reference to agency, it is un-disputed in this case, without more, that the agent transmitted the application, delivered the policies from the Franklin Insurance Company to the plaintiff, and received from plaintiff the premium and transmitted the same to the company.

We order an affirmance of the judgment.